UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MICHAEL ANTHONY ACOSTA,

                    Plaintiff,

            -v.-

STEVEN M. ROSS; DAVID KATZ; LAUREN
GEER; and RELATED MANAGEMENT
COMPANIES,

                    Defendants.

---

23 Civ. 10292 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

*Pro se* Plaintiff Michael Acosta is a long-time employee of Defendant
Related Management Companies ("Related"), who worked most recently as a
maintenance supervisor until a 2021 injury forced him to take a leave of
absence from that position.  Two years later, Plaintiff filed the instant lawsuit
against Related and several of its officers and employees (together,
"Defendants"), claiming discrimination and retaliation under federal and state
law.  Plaintiff has amended his pleadings twice since then, and his Second
Amended Complaint (the "SAC") is the operative complaint in this matter.
Defendants have filed a motion to dismiss the SAC pursuant to Federal Rule of
Civil Procedure 12(b)(6).  As set forth in the remainder of this Opinion, the
Court finds that, despite multiple opportunities, Plaintiff has not pleaded a
viable claim for discrimination or retaliation.  Accordingly, the Court grants
Defendants' motion to dismiss the SAC with prejudice.

**BACKGROUND**[1]

**A.    Factual Background**

Plaintiff Michael Acosta has been employed at Related since

approximately June 2010, and in 2015 he was promoted to on-site

maintenance supervisor at a Related property in Middletown, New York.  (FAC,

Ex. 1 at 1).  As an on-site supervisor, Plaintiff was provided an apartment on

the premises pursuant to an Occupancy Agreement, which specified that if

Plaintiff's employment with Related ended or changed from a supervisory

position, he would be required to vacate the apartment within 30 days.  (*Id.* at

226-29; Pl. Opp. 5 (noting that apartment was part of Plaintiff's

compensation)).

---

[1]    This Opinion draws its facts from the Second Amended Complaint ("SAC" (Dkt. #28)), which is the transcript of the premotion conference held on October 2, 2024, and which the Court has deemed the operative pleading in this case.  Plaintiff's well-pleaded allegations are taken as true for purposes of this Opinion.  *See Ashcroft* v. *Iqbal*, 556 U.S. 662, 678-79 (2009).  The Court also relies, as appropriate, on Plaintiff's prior Complaint ("Compl." (Dkt. #1)) and Amended Complaint ("FAC" (Dkt. #3)), and on certain materials that have been incorporated by reference in, or are integral to, Plaintiff's pleadings.  *See DiFolco* v. *MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (explaining that on a motion to dismiss, courts may consider documents incorporated by reference and documents integral to a complaint).  While the Court has looked to the FAC for clarification of certain of Plaintiff's arguments, it has not relied upon it to shore up the adequacy of Plaintiff's SAC, given the FAC's sprawling structure.  *See* Fed. R. Civ. P. 8(a)(2) ("A pleading that states a claim for relief must contain … (2) a short and plain statement of the claim showing that the pleader is entitled to relief[.]").

For ease of reference, the Court refers to Defendants' memorandum of law in support of their motion to dismiss as "Def. Br." (Dkt. #32); to Plaintiff's memorandum of law in opposition to the motion to dismiss as "Pl. Opp." (Dkt. #34); and to Defendants' reply memorandum as "Def. Reply" (Dkt. #35).  The Court cites to the page numbers supplied by the Court's electronic case filing ("ECF") system.

Plaintiff includes with his opposition memorandum an addendum comprising various documents, which he asks the Court to consider as a further amendment of his pleadings.  (SAC 10-48).  The Court has considered the addendum but, as explained herein, the relevant facts included in the addendum do not salvage Plaintiff's claims.

2

In or about September 2021, Plaintiff was injured in the course of his employment.  (FAC, Ex. 1 at 1-3).  Plaintiff advised Related of the injury, and was told to let the company know when he could return to work.  (*Id.* at 3).  After several months, and with Plaintiff's doctor advising him that he could not return to work in any capacity, Related requested that Plaintiff vacate his on-site apartment, which he did.  (*Id.* at 3).  However, as of the date of the parties' most recent submissions in this matter, Plaintiff remains a Related employee, albeit one on leave under the Family and Medical Leave Act (the "FMLA"), 29 U.S.C. §§ 2601-2654.

## B.    Procedural Background

### 1.    Plaintiff's Original and First Amended Complaints

On November 22, 2023, Plaintiff, proceeding *pro se* and *in forma pauperis*, filed a 27-page complaint (the "Complaint") against Related and several of its officers and employees, alleging claims for discrimination and retaliation under the Americans with Disabilities Act of 1990 (the "ADA"), 42 U.S.C. §§ 12101-12213, and the New York State Human Rights Law (the "NYSHRL"), N.Y. Exec. Law §§ 290-301.  One month later, and before the Complaint was served, Plaintiff filed a 240-page amended complaint (the "FAC"), inclusive of exhibits, naming Related; its Founder and Non-Executive Chairman, Stephen M. Ross; an in-house attorney at Related, David Katz; and the former Chief Human Resources Officer of Related's parent company, Lauren Geer (together with Ross and Katz, the "Individual Defendants").  The Court issued an Order of Service on May 31, 2024.  (Dkt. #6).

Defendants appeared in the matter on September 6, 2024. (Dkt. #19-20). Five days later, Defendants requested a pre-motion conference to discuss their anticipated motion to dismiss Plaintiff's FAC. (Dkt. #24). The Court granted the application and scheduled a conference to take place on October 2, 2024 (the "October 2 Conference"). (Dkt. #25).

### 2. The October 2 Conference and the SAC

Though Plaintiff had submitted hundreds of pages of information and allegations in his pleadings, his claims were not entirely clear to the Court, and thus much of the October 2 Conference was spent questioning Plaintiff regarding the specifics of his claims. The Court began by discussing Plaintiff's then-current employment situation, during which the Court learned that (i) Plaintiff had been continuously employed by Related since June 2010; (ii) Plaintiff had been injured on the job in September 2021, in an incident he blamed on a subordinate he had been forced to hire; and (iii) Plaintiff's injury claims were not before the Court, because they were being addressed in a separate workers' compensation proceeding. (SAC 4-7).

The Court then inquired — for the first of several times during the conference — "What is the discrimination that you suffered, sir?" (SAC 7). Plaintiff responded that the discrimination was the harassment he experienced about "getting COVID shots, vaccine shots, and COVID testing." (*Id.*). He explained that his religious beliefs forbade vaccination and nasal swab tests, because both processes involved the introduction of items into Plaintiff's body, which he considered "a temple in the Lord" that no one could enter "in vain."

4

(*Id.* at 8-9; *see also id.* at 9 (opining that medical professionals performing nasal swab tests were "doing evil things," because their actions "could leave any residue or any type of trace of anything inside my nasal cavity"); *id.* at 9-10 (opining that social distancing requirements were an anti-religious subterfuge designed to keep people from combining their individual "aura[s] of energy")).[2] However, when again asked to articulate the discriminatory conduct, Plaintiff noted only that he "was alienated and things were done because of that." (*Id.* at 11)  The Court sought further details, prompting Plaintiff to advance a conspiracy theory about Defendant Ross, vaccines, and the pandemic:

> John [Lackland[3]] had abused his authority in forcing him to repeat and put his signature to those promises, the barons not only reasserted their own powers, but established cardinal principles of English law that are natural law are fundamental immutable law exists and that no one, not even a king, is above that law.
>
> My belief, the law they're speaking of, whether any name, any religion, that's put to it, is that higher power of authority.  When people have money, and they start to gain power, and qualified immunities, and they start to take those qualified immunities outside of their duties, and where they belong, and they use them to sway and put people in justice and they use them in ways that take away people's constitutional rights, and control or diminish their religious beliefs, I believe that's evil.
>
> And I don't believe that anything or any person working government deals, because we said we're going to tie

---

2       Separate and apart from his religious concerns, Plaintiff explained his view that there had been "no transparency" and "all falsehoods" in connection with the rollout of the COVID vaccines, and that the vaccines themselves contained "nanobots" that would infiltrate his body.  (SAC 10).

3       John Lackland was the King of England from 1199 until 1216, during whose reign the Magna Carta was drafted.  *See* Charles D. Turner, *Magna Charta*, 4 TEX. L. REV. 46, 47-48 (1925).

> this back to the pandemic. So if we go back to the bios
> of Mr. Ross and Related managements, and we look at
> all the money, like Columbia Presbyterian, Javits
> Center that we put all those beds in there for the people
> who were expected to die. That was Related
> management.
>
>                 \*\*\*
>
> So when you have somebody that's part of the Bill and
> Melinda Gates Foundation that believes that they need
> to control the world population, and is funding all this;
> when you have a person that openly admits they are
> going to give hundreds and thousands of dollars to sway
> an election; when you have a person that says that
> when someone comes after him, that, you know, he
> won't let them, you know, he won't let it be. And this is
> an example of that.

(*Id.* at 12-13).

When again pressed for specifics by the Court, Plaintiff stated that he

had been threatened with termination of employment for refusing to take a

nasal swab test, but he then acknowledged that he had refused both

vaccination and nasal swab tests, and still remained employed. (SAC 16-18).

At or about the same time as the requests for testing, Plaintiff had been injured

on the job; after his injury, Plaintiff continued to refuse both vaccination and

nasal swab testing, without blowback from his employer. (*Id.* at 17-18).[4]

---

[4]    At one point, Plaintiff argued that the discrimination was that he "was forced out of [his] home without a reasonable accommodation." (SAC 19). However, as Plaintiff later acknowledged, the loss of the apartment was a consequence of his inability to perform the duties of an on-site supervisor, pursuant to the terms of the Occupancy Agreement. (*Id.* at 22-25; *see also id.* at 33 (defense counsel noting, without refutation, that Plaintiff's doctor reported that Plaintiff was "100 percent unable to work. And there was no end date given for that medical clearance."); *id.* at 38 (Plaintiff conceding that his doctor had refused to give him even light duty approval)). Defense counsel also noted, without dispute from Plaintiff, that Related had allowed Plaintiff to remain in the apartment for an additional eight months. (*Id.* at 34).

Plaintiff recalled that several residents of his building importuned him to "take the shot and come back to work" (*id.* at 19-20), but as Plaintiff conceded, he had never been medically cleared to return to work after his accident (*id.* at 20).

Plaintiff suggested that when he was injured, Defendants "took this opportunity to try to force [him] out," in part by what he considered to be inconsistent enforcement of company policies. (SAC 21). Plaintiff cited the fact that coworkers spoke Spanish in his presence, though he did not speak the language. (*Id.* at 22). He noted that Related had declined to hire his girlfriend to assist him because of an existing anti-nepotism policy, and continued to decline to hire her even after he was injured, but then gave his position to someone "married to one of the managers on one of the other sites." (*Id.* at 23). He recalled problems obtaining reimbursement after a business trip to Albany. (*Id.* at 23-24). And Plaintiff recalled difficulty accessing his personal effects when and after he vacated the apartment. (*Id.* at 25-26). However, Plaintiff significantly undercut his religious discrimination arguments by suddenly claiming that Related's treatment of him was because of Plaintiff's criminal history. (*Id.* at 27-28 ("I believe that these people over the years have manipulated and controlled me because I don't want to go back under the privilege. Whatever you tell me to do, I'm going to do because I don't want to go back to jail.")).

The Court then turned to Plaintiff's claims of retaliation. Plaintiff initially explained that his claim was less about any particular treatment that he had experienced, and more about his desire to obtain from the Court a "stop order"

7

so that he could be left alone to complete his physical therapy and return to work. (SAC 29-30). Plaintiff's response confused the Court, which understood that there was no longer a vaccination or a testing mandate in place at Related. (*Id.* at 30). Upon further questioning, Plaintiff changed his position, claiming that the retaliation was Defendants' "allowing the wolves to tear me apart and standing by and watching it." (*Id.* at 31). In this regard, Plaintiff adverted to "lies" fabricated against him, and repeated references to him as a "disgruntled ex-employee." (*Id.*).

The Court also spent a portion of the October 2 Conference clarifying Plaintiff's claims against the Individual Defendants. When asked to identify the conduct of Defendant Ross, for instance, Plaintiff advised the Court that he was suing Ross for failing to respond to Plaintiff's email regarding his employment issues. In a stunning turn of phrase, Plaintiff argued that Ross's reticence was "the same as Hitler allowing Hess to do the grotesque things that he did and — see, he allowed those people to do more evils than he was capable of doing himself." (SAC 15).

Turning to Defendant Katz, Plaintiff started his answer by recounting the history of his workers' compensation proceedings (which, Plaintiff had acknowledged earlier, were unrelated to the instant lawsuit), and noting that Katz was an in-house counsel who had represented Related during those proceedings. (SAC 40). Plaintiff then explained that Katz had been made aware of a dispute between Plaintiff and "Yalitza," another Related employee; that Yalitza had lied to Katz; and that Katz, as an "officer of the court," had a

"duty … to address who is rightfully wrong and who is rightfully right" between the two employees. (*Id.* at 41-43).

Defendant Geer was a human resources officer at Related's parent during the relevant time period. According to Plaintiff, he had telephoned Geer one evening after he had been asked to vacate the apartment. Geer claimed to be listening to Plaintiff during the call, but he heard her "crunching on her food and giggling and laughing in the background." (SAC 43). Geer promised to speak to "her ground crew" and call Plaintiff the next day, but did not. (*Id.* at 44).[5]

### 3.    The Instant Motion

Near the close of the October 2 Conference, the Court determined that, "rather than troubling [Plaintiff] to replead his allegations, what I am going to do is to deem his complaint … amended by what has been said today." (SAC 35). It then set a schedule for Defendants' motion to dismiss. (*Id.* at 35-37).

Defendants filed their opening submissions on their motion to dismiss on November 15, 2024. (Dkt. #30-33). Plaintiff filed his submission in opposition on December 30, 2024. (Dkt. #34). Defendants then filed their reply papers on January 22, 2025, concluding briefing on their motion. (Dkt. #35-36).[6]

---

[5]      *See also* SAC 47:

> MR. ACOSTA: Mr. Katz was, look, I said he knew what was going on. Mr. Katz had an opportunity to reach out, talk to the team, Ms. Geer had an opportunity to document, it was her duty to document and actually follow up on the complaint. And I believe Mr. Ross, once he learned of it, see, Mr. Ross isn't so distant[ ]. He made sure his name is on everything.

[6]      Plaintiff has filed several motions with the Court that were not granted. After filing his Complaint on the public docket and before Defendants appeared, Plaintiff sought both

## DISCUSSION

### A.    Applicable Law

### 1.    Motions to Dismiss Under Rule 12(b)(6)

A defendant can move to dismiss claims for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6).  When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court must "draw all reasonable inferences in [the plaintiff's] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief."  *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted); *see also Ashcroft* v. *Iqbal*, 556 U.S. 662, 678-79 (2009).  A plaintiff is entitled to relief if he alleges "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007); *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) ("While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to nudge[ ] [the plaintiff's] claims across the line from conceivable

---

anonymization of the complaint and a request for early mediation or a speedy trial. (Dkt. #10, 12, 17).  Then, shortly after Defendants submitted their pre-motion letter, Plaintiff requested that their motions to dismiss be summarily denied, in light of, among other things, the right-to-sue letter he had received from the Equal Employment Opportunity Commission (the "EEOC").  (Dkt. #24).  More recently, after the conclusion of briefing on this motion, Plaintiff submitted letters to the Court (i) asking the Court to quickly deny Defendants' motion (Dkt. #38); and (ii) expressing his "frustration" with the litigation process and increasing his demands to $10 billion, 500,000 acres of land, and $2 billion in gold, silver, and platinum (Dkt. #39).

to plausible." (internal quotation marks omitted) (quoting *Twombly*, 550 U.S. at 570)).

That said, a court is "not bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions." *Rolon* v. *Henneman*, 517 F.3d 140, 149 (2d Cir. 2008) (internal quotation marks omitted) (quoting *Smith* v. *Local 819 I.B.T. Pension Plan*, 291 F.3d 236, 240 (2d Cir. 2002); *see also Harris* v. *Mills*, 572 F.3d 66, 72 (2d Cir. 2009) ("[A]lthough a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." (internal quotation marks omitted and alteration adopted) (quoting *Iqbal*, 556 U.S. at 678)). Moreover, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted) (quoting *Twombly*, 550 U.S. at 557-58).

On a motion to dismiss under Rule 12(b)(6), a court "may review only a narrow universe of materials." *Goel* v. *Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016). This includes "any written instrument attached to the [c]omplaint as an exhibit, any statements or documents incorporated by reference in the [c]omplaint, documents that are 'integral' to the [c]omplaint even if they are not incorporated by reference, and matters of which judicial notice may be taken." *Donoghue* v. *Gad*, No. 21 Civ. 7182 (KPF), 2022 WL 3156181, at *2 (S.D.N.Y.

Aug. 8, 2022) (citing *Chambers* v. *Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002); *Goel*, 820 F.3d at 559).

Furthermore, when a plaintiff is *pro se*, "courts must construe [his] pleadings broadly, and interpret them 'to raise the strongest arguments that they suggest.'" *Cruz* v. *Gomez*, 202 F.3d 593, 597 (2d Cir. 2000) (quoting *Graham* v. *Henderson*, 89 F.3d 75, 79 (2d Cir. 1996)). "However inartfully pleaded, a *pro se* complaint may not be dismissed under Rule 12(b)(6) unless it appears beyond doubt that the plaintiff can prove no set of facts in support of her claim which would entitle her to relief." *Legeno* v. *Corcoran Grp.*, 308 F. App'x 495, 496 (2d Cir. 2009) (summary order) (internal quotation marks and alterations omitted) (quoting *Posr* v. *Ct. Officer Shield No. 207*, 180 F.3d 409, 413-14 (2d Cir. 1999)). "That said, the liberal pleading standard accorded to *pro se* litigants is not without limits, and all normal rules of pleading are not absolutely suspended." *Hill* v. *City of New York*, No. 13 Civ. 8901 (KPF), 2015 WL 246359, at *2 (S.D.N.Y. Jan. 20, 2015) (internal quotation marks and citation omitted). To survive a Rule 12(b)(6) motion to dismiss, a *pro se* plaintiff's factual allegations still must at least "be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. And even in the *pro se* context, the court is not bound to accept "conclusory allegations or legal conclusions masquerading as factual conclusions." *Rolon*, 517 F.3d at 149 (quoting *Smith*, 291 F.3d at 240).

### 2.    Pleading Requirements for Employment Discrimination and Retaliation Claims

In the FAC, Plaintiff claims violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2000e17; the Rehabilitation Act of 1973, 29 U.S.C. §§ 701-796; the ADA; and the FMLA.  (Dkt. #3 at 3-4).  During the October 2 Conference, however, Plaintiff made clear that his claims concerned Defendants' conduct towards him after Plaintiff declined to submit to COVID vaccination or nasal swab tests.  As such, and consistent with its obligation to construe a plaintiff's allegations to raise the strongest claims that they suggest, even if the plaintiff has failed to check the appropriate blanks on a court-issued complaint form, the Court considers Plaintiff to raise claims for religious discrimination and retaliation under Title VII and its state and city counterparts, the NYSHRL and the NYCHRL.  *See McLeod* v. *Jewish Guild for the Blind*, 864 F.3d 154, 158 (2d Cir. 2017).[7]

### a.    Title VII

### i.    Discrimination

Title VII makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his

---

[7]    A review of the elements of the remaining causes of action confirms their inapplicability to this case.  To establish a failure to accommodate claim under the ADA, an individual must show "[i] he is disabled within the meaning of the ADA; [ii] his employer is a covered entity; [iii] he could perform the essential functions of his job with an accommodation; and [iv] the defendants refused to provide such an accommodation despite being on notice."  *Fox* v. *Costco Wholesale Corp.*, 918 F.3d 65, 73 (2d Cir. 2019) (citation omitted); *see also* 29 U.S.C. §§ 791(f), 794(d) (amendments to Rehabilitation Act providing that employment discrimination claims are to be construed using the same standards as the ADA).  Here, Plaintiff confirmed that he had not been medically cleared to return to work in any capacity, and thus could not state a claim under either statute.  Nor has Plaintiff alleged a viable FMLA interference claim, which would require him to plead that: (i) he was eligible for FMLA benefits; (ii) Related was subject to the

compensation, terms, conditions, or privileges of employment, because of such individual's … religion."  42 U.S.C. § 2000e-2(a)(1).  Title VII defines "religion" as including "all aspects of religious observance and practice, as well as belief," and imposes an obligation on an employer "to reasonably accommodate to an employee's … religious observance or practice" unless doing so would cause "undue hardship on the conduct of the employer's business."  42 U.S.C. § 2000e(j).[8]

Courts analyze claims for discrimination pursuant to Title VII under the framework set forth by the Supreme Court in *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792, 802-04 (1973).  "To establish a *prima facie* case of religious discrimination for failure to accommodate, Plaintiff must show that [i] he held a '*bona fide* religious belief conflicting with an employment requirement'; [ii] he informed his employer of this belief; and [iii] he was 'disciplined for failure to comply with the conflicting employment requirement.'" *Algarin* v. *NYC Health + Hosps. Corp.*, 678 F. Supp. 3d 497, 508 (S.D.N.Y. 2023) (quoting *Knight* v. *Conn. Dep't of Pub. Health*, 275 F.3d 156, 167 (2d Cir.

---

FMLA; (iii) he was entitled to FMLA leave; (iv) he gave notice to Related of his intention to take leave, and (v) he was denied FMLA benefits to which he was entitled.  *See LaRose* v. *Am. Med. Response of Conn., Inc.*, No. 24-962, 2025 WL 1524053, at *1 (2d Cir. May 29, 2025) (summary order).

Using a similar analysis, the Court has only considered Plaintiff's allegations that he suffered discrimination and retaliation because of his religious beliefs; even viewing Plaintiff's claims liberally, the Court finds no evidence in the record from which Plaintiff can allege that he was discriminated or retaliated against because of his race, ethnicity, prior history of substance abuse, or criminal history.

[8]    The Court assumes for purposes of this Opinion that Plaintiff's religious beliefs are sincerely held.  *See Matos* v. *Discovery Commc'ns, LLC*, 750 F. Supp. 3d 307, 319 (S.D.N.Y. 2024) ("But, relevant here, courts widely recognize that inquiry into a plaintiff's sincerity is 'inappropriate for resolution on a motion to dismiss' because it turns on a plaintiff's credibility." (collecting cases)).

2001));[9] *accord Pastor* v. *Mercy Med. Ctr.*, No. 22 Civ. 7847 (JMA), 2024 WL 3029118, at *3 (E.D.N.Y. June 17, 2024); *Cagle* v. *Weill Cornell Med.*, 680 F. Supp. 3d 428, 435 (S.D.N.Y. 2023). "If the *prima facie* case is shown, 'the burden then shifts to the employer to show it could not accommodate the employees' religious beliefs without undue hardship.'" *Algarin*, 678 F. Supp. 3d at 508 (quoting *Knight*, 275 F.3d at 167); *see also Cagle*, 680 F. Supp. 3d at 435 ("If the employee is able to make out a *prima facie* case, the burden shifts to the employer to show that it either offered the employee a reasonable accommodation or that doing so would cause an undue burden." (citing *Baker* v. *Home Depot*, 445 F.3d 541, 546 (2d Cir. 2006))). At the motion to dismiss stage, a plaintiff "is not required to plead a *prima facie* case under *McDonnell Douglas*[.]" *Vega* v. *Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 84 (2d Cir.

---

[9]     The Court has construed Plaintiff's religious discrimination claims as claims for failure to accommodate. It recognizes that under Title VII and the NYSHRL, there is a separate cause of action for adverse employment actions taken against an employee because of his religion. However, the Court finds that no such claim can be plausibly alleged here, given the absence of a qualifying adverse employment action. In the Title VII context, for instance,

> "A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment." *Galabya* v. *N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (internal quotation marks omitted). "An adverse employment action is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities." *Terry* v. *Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003) (internal quotation marks omitted). "Examples of materially adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Id.* (alteration omitted) (internal quotation marks omitted). We have held that the assignment of "a disproportionately heavy workload" can constitute an adverse employment action." [Feingold v. New York, 366 F.3d 138, 152-53 (2d Cir. 2004)].

*Vega* v. *Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85 (2d Cir. 2015).

2015).  Instead, "[t]he facts alleged must give plausible support to the reduced

requirements that arise under *McDonnell Douglas* in the initial phase of a Title

VII litigation."  *Littlejohn* v. *City of New York*, 795 F.3d 297, 311 (2d Cir. 2015);

*see also id.* ("The facts required by *Iqbal* to be alleged in the complaint need not

give plausible support to the ultimate question of whether the adverse

employment action was attributable to discrimination.  They need only give

plausible support to a minimal inference of discriminatory motivation.").

The Second Circuit has recently reaffirmed the pleading requirements for

claims of religious discrimination under Title VII:

> To survive a motion to dismiss, a plaintiff asserting a
> claim of religious discrimination under Title VII must
> plausibly allege that "(1) [he or she] held a *bona fide*
> religious belief conflicting with an employment
> requirement; (2) [he or she] informed [his or her]
> employer[ ] of this belief; and (3) [he or she was]
> disciplined for failure to comply with the conflicting
> employment requirement." *Knight* v. *Conn. Dep't of Pub.
> Health*, 275 F.3d 156, 167 (2d Cir. 2001).  Nonetheless,
> an employer does not violate Title VII if offering a
> reasonable accommodation "would cause the employer
> to suffer an undue hardship." *Cosme* v. *Henderson*, 287
> F.3d 152, 158 (2d Cir. 2002).  The Supreme Court has
> recently clarified that the undue hardship must be more
> than *de minimis* — it must be "substantial in the overall
> context of an employer's business." *Groff* v. *DeJoy*, 600
> U.S. 447, 468 (2023).

*Does 1-2* v. *Hochul*, No. 22-2858, 2024 WL 5182675, at *3 (2d Cir. Dec. 20,

2024) (summary order); *accord New Yorkers for Religious Liberty, Inc.* v. *City of

New York*, 125 F.4th 319, 333 (2d Cir. 2025); *D'Cunha* v. *Northwell Health Sys.*,

No. 23-476-cv, 2023 WL 7986441, at *2 (2d Cir. Nov. 17, 2023) (summary

order).  Additionally, an employee must plausibly allege that she "'actually

requires an accommodation of ... her religious practice' and that 'the
employer's desire to avoid the prospective accommodation was a motivating
factor in an employment decision.'" *Lowman* v. *NVI LLC*, 821 F. App'x 29, 31
(2d Cir. 2020) (summary order) (quoting *E.E.O.C.* v. *Abercrombie & Fitch Stores,
Inc.*, 575 U.S. 768, 773-74 (2015)).

### ii.    Retaliation

Title VII's anti-retaliation provision prohibits an employer from
"discriminat[ing] against any of [its] employees ... because [the employee] has
opposed any practice made an unlawful employment practice by this
subchapter."  42 U.S.C. § 2000e-3(a).  In other words, "Title VII forbids an
employer to retaliate against an employee for ... complaining of employment
discrimination prohibited by Title VII."  *Kessler* v. *Westchester Cnty. Dep't of
Soc. Servs.*, 461 F.3d 199, 205 (2d Cir. 2006).

Courts analyze claims for retaliation pursuant to Title VII under the
same *McDonnell Douglas* framework.  *See Zann Kwan* v. *Andalex Grp. LLC*, 737
F.3d 834, 843 (2d Cir. 2013) ("Federal and state law retaliation claims are
reviewed under the burden-shifting approach of *McDonnell Douglas*[.]").  "Under
the first step of the *McDonnell Douglas* framework, the plaintiff must establish
a *prima facie* case of retaliation[.]"  *Id.* at 844 (citation omitted).  "Once a *prima
facie* case of retaliation is established, the burden of production shifts to the
employer to demonstrate that a legitimate, non[-]discriminatory reason existed
for its action."  *Summa* v. *Hofstra*, 708 F.3d 115, 125 (2d Cir. 2013) (quoting
*Raniola* v. *Bratton*, 243 F.3d 610, 625 (2d Cir. 2001)).  "If the employer

demonstrates a legitimate, non-discriminatory reason, then the burden shifts back to the plaintiff to establish, through either direct or circumstantial evidence, that the employer's action was, in fact, motivated by discriminatory retaliation." *Alvarado* v. *United Hospice, Inc.*, 631 F. Supp. 3d 89, 117 (S.D.N.Y. 2022) (quotation marks and citation omitted).

"Significantly, a plaintiff alleging retaliation in violation of Title VII must show at the final step of the analysis that retaliation was a 'but-for' cause of the adverse action, not simply a 'substantial' or 'motivating' factor in the employer's decision." *Nieblas-Love* v. *N.Y.C. Hous. Auth.*, 165 F. Supp. 3d 51, 70 (S.D.N.Y. 2016) (citation omitted). "The employee at all times bears the burden of persuasion to show retaliatory motive." *Cox* v. *Onondaga Cnty. Sheriff's Dep't*, 760 F.3d 139, 145 (2d Cir. 2014) (citation omitted). "As with other claims analyzed under the *McDonnell Douglas* framework, the allegations [in the operative complaint] need only give plausible support to the reduced *prima facie* requirements." *Thomson* v. *Odyssey House*, No. 14 Civ. 3857 (MKB), 2015 WL 5561209, at *20 (E.D.N.Y. Sept. 21, 2015) (alterations adopted) (quotation marks and citation omitted).

To plausibly plead a *prima facie* case of retaliation, a plaintiff must establish that: "[i] []he was engaged in protected activity, [ii] the alleged retaliator knew that plaintiff was involved in protected activity, [iii] an adverse decision or course of action was taken against plaintiff and [iv] a causal connection exists between the protected activity and the adverse action." *Medina* v. *AAM 15 Mgmt. LLC*, 750 F. Supp. 3d 332, 344 (S.D.N.Y. 2024)

18

(quoting *Atherley* v. *N.Y.C. Dep't of Educ.*, No. 23 Civ. 383 (JGLC), 2024 WL 1345741, at *11 (S.D.N.Y. Mar. 29, 2024) (quotation marks and citation omitted)); *accord Tafolla* v. *Heilig*, 80 F.4th 111, 125 (2d Cir. 2023).  In this context, protected activities include not only formal charges of discrimination, but, more broadly, any "oppos[ition] [to] any practice made an unlawful employment practice" under Title VII.  42 U.S.C. § 2000e–3(a); *Townsend* v. *Benjamin Enters., Inc.*, 679 F.3d 41, 48 (2d Cir. 2012).  As with claims for discrimination, "[a] plaintiff's burden at this *prima facie* stage is *de minimis.*" *Treglia* v. *Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002); *see also Kirkland-Hudson*, 665 F. Supp. 3d at 459.

> **b.    The NYSHRL**

The NYSHRL provides that "[i]t shall be an unlawful discriminatory practice … [f]or an employer … because of an individual's … creed … to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."  N.Y. Exec. Law § 296(1)(a).  The pleading standards for NYSHRL claims were considered to be the same as those for Title VII until the New York legislature amended the NYSHRL on August 19, 2019.  *See Syeed* v. *Bloomberg, L.P.*, 568 F. Supp. 3d 314, 343 (S.D.N.Y. 2021), *vacated and remanded on other grounds*, No. 22-1251, 2024 WL 2813563 (2d Cir. June 3, 2024) (summary order).  The amendment provided that the NYSHRL was to be "construed liberally for the accomplishment of the remedial purposes thereof, regardless of whether federal civil rights laws, including those laws with

provisions worded comparably to the provisions of this article, have been so construed." N.Y. Exec. Law § 300. This amendment "only appl[ies] to claims that accrue on or after the effective date of October 11, 2019," which would include Plaintiff's claims here. *Wellner* v. *Montefiore Med. Ctr.*, No. 17 Civ. 3479 (KPF), 2019 WL 4081898, at *5 n.4 (S.D.N.Y. Aug. 29, 2019).

"The case law … has yet to definitively resolve whether the NYSHRL's liability standard is now coextensive with that of the NYCHRL, or whether it requires more, so as to impose a standard between federal and city law." *Wheeler* v. *Praxair Surface Techs., Inc.*, 694 F. Supp. 3d 432, 451 (S.D.N.Y. 2023) (collecting cases). This Court has previously "assume[d]" for purposes of a Rule 12(b)(6) motion "that the amended NYSHRL aligns with the NYCHRL," *Wright* v. *City of New York*, No. 23 Civ. 3149 (KPF), 2024 WL 3952722, at *6 (S.D.N.Y. Aug. 27, 2024), and does so here.

### c.    The NYCHRL

The NYCHRL makes it unlawful "[f]or an employer or an employee or agent thereof, because of the actual or perceived … creed … of any person … [t]o discriminate against such person in compensation or in terms, conditions or privileges of employment." N.Y.C. Admin. Code § 8-107(1)(a)(3). To state a viable discrimination claim under the NYCHRL (and, for purposes of this motion, the post-amendment NYSHRL), a plaintiff need not allege that he suffered an adverse employment action or that "discriminatory animus was the but-for cause or even the primary motivation of their alleged mistreatment." *Delo* v. *Paul Taylor Dance Found., Inc.*, 685 F. Supp. 3d 173, 183 (S.D.N.Y.

2023).  Rather, he must allege only that he has been "treated less well at least in part because of [his] gender." *Id.* (internal quotation marks omitted) (quoting *Mihalik* v. *Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013)).

In doing so, a plaintiff must still allege "differential treatment that is 'more than trivial, insubstantial, or petty.'" *Torre* v. *Charter Comm'cns, Inc.*, 493 F. Supp. 3d 276, 285 (S.D.N.Y. 2020) (quoting *Gorman* v. *Covidien, LLC*, 146 F. Supp. 3d 509, 530 (S.D.N.Y. 2015)).  "That is, ... 'a plaintiff must only show differential treatment of any degree based on a discriminatory motive[.]" *Nezaj* v. *PS450 Bar & Rest.*, 719 F. Supp. 3d 318, 330 (S.D.N.Y. 2024) (quoting *Gorokhovsky* v. *N.Y.C. Hous. Auth.*, 552 F. App'x 100, 102 (2d Cir. 2014) (summary order)).  "Unlike Title VII, the NYCHRL thus does not require a connection between the discriminatory conduct and a materially adverse employment action." *Id.* at 330-31 (internal quotation marks omitted); *see also Mihalik*, 715 F.3d at 114 ("[E]ven assuming that [the plaintiff] could not prove she was dismissed for a discriminatory reason ... , [the plaintiff] could still recover for any other differential treatment based on her gender.").  "While the NYCHRL is 'not a general civility code,' it should be construed 'broadly in favor of discrimination plaintiffs, to the extent that such construction is reasonably possible[.]'" *Delo*, 685 F. Supp. 3d at 183 (quoting *Mihalik*, 715 F.3d at 109, 113).

Retaliation claims under the NYCHRL are subject to "a similar but slightly broader standard: a plaintiff claiming retaliation must demonstrate

'that she took an action opposing her employer's discrimination and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action.'"  *Qorrolli* v. *Metro. Dental Assocs.*, 124 F.4th 115, 122 (2d Cir. 2024) (quoting *Mihalik*, 715 F.3d at 112); *see also Kulick* v. *Gordon Prop. Grp., LLC*, No. 23 Civ. 9928 (KPF), 2025 WL 448333, at *13 (S.D.N.Y. Feb. 7, 2025) ("The elements of a *prima facie* case of retaliation under the NYCHRL (and the post-amendment NYSHRL) are identical to those under Title VII, 'except that the plaintiff need not prove any 'adverse' employment action; instead, [she] must prove that something happened that would be reasonably likely to deter a person from engaging in protected activity.'" (alteration in original) (quoting *Leon* v. *Columbia Univ. Med. Ctr.*, No. 11 Civ. 8559 (NSR), 2013 WL 6669415, at *12 (S.D.N.Y. Dec. 17, 2013))).

**B.    Analysis**

> **1.    Plaintiff Has Failed to Plead a Viable Discrimination or Retaliation Claim Based on His Religion**

The Court begins its analysis by clarifying what this case is *not* about. This case is not about Plaintiff's September 2021 workplace accident, its causes, or the wisdom of Related's hiring decisions.  (*See, e.g.*, SAC 4-7; Pl. Opp. 10).  The Court discussed these issues with Plaintiff during the October 2 Conference to provide context for his employment history, and to confirm that Plaintiff's injury foreclosed him from performing his duties as an on-site maintenance supervisor.  Similarly, this case is not about the wisdom or the efficacy of New York's workers' compensation system, although Plaintiff has decried that system at length in his submissions to the Court.  (*See, e.g.*,

SAC 20-21; Pl. Opp. 6, 10-12, 16, 40-41).  And the Court will not engage with Plaintiff's depiction of this case as a battle in the war against "tyrants."  (*See, e.g.*, Pl. Opp. 5-7, 12-13, 15, 16, 17-18 (references to "tyrants"); *see also, e.g.*, *id.* at 5 ("Plaintiff argues that the defense sees Mr. Acosta as less than and someone they can control or dispose of[.]"); SAC 28).

        Instead, this case is about whether any of the Defendants discriminated against Plaintiff, or retaliated against him, because of his religious beliefs.  As Plaintiff's own admissions make clear, they did not.  As an initial matter, the Court finds that Defendants have fairly and accurately recounted the pleadings and the record in this case, and it incorporates by reference the legal analyses set forth in the defense submissions, which analyses are largely echoed in this Opinion.  (*See* Def. Br.; Def. Reply).  Turning to the relevant factual allegations in this case, the Court finds that Plaintiff was a Related employee of long-standing who, upon his promotion to maintenance supervisor in 2015, was entitled to on-site housing in order to perform the essential functions of his job. Those functions necessarily involved manual labor, be it cleaning and maintaining common areas, facilitating garbage disposal, or removing snow. (*See, e.g.*, FAC, Ex. 1 at 9, 30; SAC 6-7).  Indeed, as Plaintiff noted, the onset of the COVID-19 pandemic increased the amount of work required to keep common areas clean and sanitized.  (FAC, Ex. 1 at 39; SAC 7-8).  Regrettably, Plaintiff was injured on the job in September 2021; years later, Plaintiff still has not received medical clearance from his doctor to return to work, even to

perform light duty.  (SAC 33-34, 38).[10]  Yet Plaintiff remains a Related employee.

Plaintiff claims that he was discriminated against because of his religious beliefs.  He was not.  To review, Plaintiff claims that his religious beliefs proscribed vaccination, but when he sought an exemption from Related's vaccination requirement, he received one.  (FAC, Ex. 1 at 25-26; SAC 18). Given the nature of Plaintiff's duties and the then-ongoing public health emergency, Related offered Plaintiff the accommodation of nasal swab testing, an accommodation that Plaintiff also refused on religious grounds.  Plaintiff was never vaccinated and never submitted to nasal swab testing, and yet he experienced no discipline, much less an adverse employment action, as a result of these refusals.  (SAC 16-17; *see also id.* at 4, ("THE COURT: You are still employed today?  MR. ACOSTA: Yes."), 17 ("I was not fired."), 18 ("I'm still an employee[.]")).

When asked to identify the precise discrimination he experienced as a result of his religious objections, Plaintiff cited the loss of his apartment. (SAC 19).  However, while Plaintiff theorized that Related had "wanted to get rid of [him] because they knew I was going to keep on fighting and not getting tested" (*id.*), his theories are not borne out by the record.  Quite to the contrary, as Plaintiff himself admitted, his injury in September 2021 foreclosed his ability to perform the essential functions of his job.  (*Id.* at 20 (Plaintiff

---

[10]     Precisely for this reason, Plaintiff's references to other Related employees who were given light duty assignments are irrelevant to this lawsuit.  (*See, e.g.*, SAC 38-39).

conceding that he was not "medically cleared for work"), 38 ("I even tried to see

if my doctor would give me some kind of light duty approval and he said no.")).

Under his Occupancy Agreement, Plaintiff was no longer entitled to a free on-

site apartment. (FAC, Ex. 1 at 226-29). However, Plaintiff remained a Related

employee throughout the relevant time period and beyond.[11]

Plaintiff also claimed that Related discriminated against him by

harassing him "about getting COVID shots, vaccine shots, and COVID testing."

(SAC 7). However, Plaintiff later clarified that this pestering was done by

"[t]enants of the building." (*Id.* at 7-11, 19-20, 29). Such conduct, even if true,

cannot support a claim for Title VII discrimination based on religion. In his

opposition submission, Plaintiff changes course, and argues that the tenants'

pestering was the product of unspecified Related employees spreading "false

gossip" about him. (Pl. Opp. 3). However, these conclusory allegations, with

neither details nor any indication of causal connection, cannot suffice to state

a Title VII discrimination claim, even under the relaxed pleading standards that

apply at the motion to dismiss stage. *See, e.g.*, *Fitzgerald* v. *Sodexo Inc.*, No. 22

Civ. 3410 (AMD) (LKE), 2025 WL 857981, at *8 (E.D.N.Y. Mar. 19, 2025)

("Although the plaintiff's initial burden to establish an inference of

discrimination is low, the record must contain more than 'vague and

conclusory' allegations."); *Sung* v. *DeJoy*, No. 22 Civ. 7682 (HG) (LB), 2024 WL

---

[11]     Plaintiff suggests that Related was inconsistent in its enforcement of internal policies,
         including policies regarding employees staying in other people's residences and parking
         cars on Related property. (*See, e.g.*, SAC 21). However, Plaintiff does not allege that he
         was ever disciplined for violating these policies, much less that the proffered
         inconsistent enforcement was in any way related to his religious beliefs.

4107212, at *12 (E.D.N.Y. Sept. 5, 2024) ("At bottom, Plaintiff's allegations paint the picture of workplace in which there was a breakdown of his relationships with supervisors, coworkers, and customers, and in which he became deeply unhappy. Those facts, though, do not entitle Plaintiff to relief under civil rights statutes, which protect him against discrimination." (internal citations omitted)).

Finally, Plaintiff suggests that he was subjected to harassment when trying to retrieve his personal effects. (SAC 5, 26-27). Plaintiff notes that when he went to retrieve his tools from a work area, Related employees had commingled personal belongings, company property, and garbage, such that Plaintiff was forced to go through various piles to find and retrieve his belongings. (*Id.* at 26). However, Plaintiff conceded that part of the reason for his delayed access to his property was because his tools were housed in a Related work area, to which he did not have access once he went on medical leave. (*Id.* at 5). In addition, when asked whether this harassment was a product of Plaintiff's stance on vaccines and testing, Plaintiff launched into a detailed argument that the employees' conduct was in fact an effort to "manipulate[] and control[]" Plaintiff because of his prior criminal history. (*Id.* at 27-28).[12]

---

[12]    The Court observes that Plaintiff's repeated suggestions that Related employees' conduct towards him was motivated by some other factor, such as his prior criminal history or substance abuse, only further undercut his claim that such conduct was motivated by hostility towards his religion. (*See, e.g.*, SAC 26-27 (Plaintiff arguing that his co-workers antagonized him because "[t]hey know when I was hired, I was hired for a specific reason," *i.e.*, because he had spent time in prison and would rid the residential complex of drug dealers), 28 ("I believe that these people over the years have manipulated and controlled me because I don't want to go back under the privilege.

Similar problems undermine Plaintiff's claims of retaliation.  For these purposes, the Court will assume that Plaintiff has adequately pleaded that he engaged in protected activity by complaining about Related's vaccination policy. However, Plaintiff has not pleaded facts from which this Court can discern any retaliatory conduct because of that protected activity.  At the October 2 Conference, Plaintiff first suggested that his claim was a preemptive one, in which he sought a "stop order" from the Court so that he could complete his physical therapy and return to work without future harassment or discrimination.  (SAC 29-30).  Such a claim would appear to be moot, insofar as the Court understands that Related no longer maintains COVID-related vaccination or testing requirements.  (*Id.* at 30-31).  In any event, there can be no preemptive claim for retaliation, because retaliation presupposes a causal connection between an actual (and not contemplated) protected activity and an actual (and not contemplated) adverse employment action.

Plaintiff also claimed retaliation in the form of Defendants "allowing the wolves to tear me apart and standing by and watching it."  (SAC 31).  To the extent the Court understands this claim, it appears to involve co-workers fabricating unspecified lies against Plaintiff, referring to him as a "disgruntled ex-employee," and impeding his ability to retrieve his personal effects in the

Whatever you tell me to do, I'm going to do because I don't want to go back to jail."); Pl. Opp. 4 (discussing his "recovery and accomplishments in rehabilitation and conformity to society," and suggesting that he was a "person with disability" because of his successful rehabilitative efforts), 12-13 (suggesting that Defendants are seeking to drag out the instant litigation and/or Plaintiff's workers' compensation proceedings until "Plaintiff is either dead or back homeless on drugs and alcohol")).

27

course of vacating his apartment.  (*Id.*; *see also id.* at 22-26).  The Court agrees
with Defendants that, on this record, Plaintiff has failed to allege that these
workplace disputes were the result of Plaintiff engaging in protected activity.
(*See* Def. Br. 17-18).  And as noted earlier, Plaintiff retained his employment at
Related throughout the relevant time period, despite refusing both vaccination
and testing, and only had to vacate his apartment when he became unable to
perform the essential functions of his job and could offer no timetable for his
medical clearance.  *Cf. Adams* v. *N.Y. State Unified Ct. Sys.*, No. 22 Civ. 9739
(JMF), 2023 WL 5003593, at *4 (S.D.N.Y. Aug. 4, 2023) ("Put differently,
Adams's termination followed ineluctably from the policy that Defendants
announced before Adams applied for an exemption; it was neither personal to
her nor based on any protected activity.  In other words, it was set in motion
before she requested a religious accommodation.  'It is well-settled that an
adverse employment action cannot serve as the basis for a retaliation claim if
the action was set in motion before a plaintiff engaged in protected activity.'"
(internal citations omitted)).[13]

---

[13]    In his prior pleadings, Plaintiff referred to his employment at Related as a "hostile work
environment."  (*See, e.g.*, FAC 3).  To the extent Plaintiff's current pleadings are meant
to raise a Title VII claim based on a hostile work environment, the claims must fail.  As
the Second Circuit has explained:

> Title VII "does not set forth a general civility code for the American
> workplace," *Burlington Northern & Santa Fe Ry. Co.* v. *White*, 548
> U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) ("Burlington
> Northern") (internal quotation marks omitted); but "[w]hen [a]
> workplace is permeated with 'discriminatory intimidation, ridicule,
> and insult' ... that is *sufficiently severe or pervasive to alter the
> conditions of the victim's employment and create an abusive working
> environment,*' ... Title VII is violated," *Harris* v. *Forklift Systems, Inc.*,
> 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (quoting

Even under the more liberal pleading requirements of the NYCHRL, which the Court also applies to Plaintiff's NYSHRL claims, Plaintiff fails to state a viable claim.  To review, a discrimination claim under the NYCHRL (and, at least for purposes of this Opinion, the NYSHRL) requires a plaintiff to allege that he was treated "less well than other similarly situated employees, at least in part for discriminatory reasons." *Xiang* v. *Eagle Enters., LLC*, No. 19 Civ. 1752 (LJL), 2022 WL 785055, at *18 (S.D.N.Y. Mar. 15, 2022).  The plaintiff must also allege "differential treatment that is 'more than trivial, insubstantial, or petty.'" *Torre* v. *Charter Comm'cns, Inc.*, 493 F. Supp. 3d 276, 285 (S.D.N.Y. 2020) (quoting *Gorman* v. *Covidien, LLC*, 146 F. Supp. 3d 509, 530 (S.D.N.Y. 2015)).  By contrast, the elements of a *prima facie* case of retaliation under the NYCHRL and the NYSHRL are identical to those under Title VII, "except that the plaintiff need not prove any 'adverse' employment action; instead, he must prove that something happened that would be reasonably likely to deter a person from engaging in protected activity." *Leon*, 2013 WL 6669415, at *12; *accord Stinson* v. *Morningstar Credit Ratings, LLC*, No. 22 Civ. 6164 (JLR), 2024

---

*Meritor Savings Bank, FSB* v. *Vinson*, 477 U.S. 57, 65, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (emphasis ours)).

To prove a hostile work environment in violation of Title VII, a plaintiff must establish both objective and subjective elements. The misconduct shown must have been "severe or pervasive enough to create an objectively hostile or abusive work environment," that is, "an environment that a reasonable person would find hostile or abusive." *Harris*, 510 U.S. at 21, 114 S.Ct. 367.  And the victim must have "subjectively perceive[d] the environment to be abusive." *Id.*

*Moll* v. *Telesector Res. Grp., Inc.*, 94 F.4th 218, 228-29 (2d Cir. 2024).  The workplace incidents described by Plaintiff at the October 2 Conference are not sufficiently severe or pervasive to state a claim for hostile work environment.

WL 3848515, at *23 (S.D.N.Y. Aug. 16, 2024).  For all of the reasons discussed in this section, Plaintiff's allegations are insufficient under the Title VII standards; more than that, Plaintiff has failed to show that he was treated less well because of his religious beliefs, or that Related's conduct toward him would deter a person from engaging in protected activity, and he therefore fails to state a claim for discrimination or retaliation under the NYSHRL and the NYCHRL.

Finally, while the Court's analysis to this point has lumped all of the Defendants together, the law requires dismissal of Plaintiff's claims against the Individual Defendants for several reasons.  To begin, Title VII does not allow for liability against individuals.  *See Tomka* v. *Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1995).  The NYSHRL similarly "does not render employees liable as individual employers."  *Doe* v. *Bloomberg, L.P.*, 36 N.Y.3d 450, 458 (2021).  And while the NYSHRL allows liability for aiding and abetting a liable employer, *Nezaj*, 719 F. Supp. 3d at 329-30 (citing *Baptiste* v. *City Univ. of N.Y.*, 680 F. Supp. 3d 415, 427 (S.D.N.Y. 2023)), Plaintiff has not alleged that any of the Individual Defendants aided and abetted an NYSHRL violation.  After all, "aiding and abetting liability requires that the aider and abettor share the intent or purpose of the principal actor."  *McHenry*, 510 F. Supp. 3d at 68 (internal quotation marks omitted).  More fundamentally, "liability must first be established as to the employer/principal before accessorial liability can be found as to an alleged aider and abettor."  *DeWitt* v. *Lieberman*, 48 F. Supp. 2d 280, 293 (S.D.N.Y. 1999).  In other words, a plaintiff must allege that there was

a principal actor — an employer — whose unlawful discriminatory conduct the alleged aider and abettor was aiding and abetting.  No such showing has been made by Plaintiff.

Consistent with its broader reach, the NYCHRL "extends liability to employees, not just employers." *Nezaj*, 719 F. Supp. 3d at 329.  Therefore, an individual employee can be held liable under the NYCHRL for his own participation in discrimination, as well as for aiding and abetting another's discriminatory conduct.  *Id.*  However, the conduct ascribed to each of the Individual Defendants simply does not suffice to state a claim under the NYCHRL under either a principal or an aider-and-abettor theory.  The Court will not consider Plaintiff's more conspiratorially-minded allegations concerning Defendant Ross; what is left is the allegation that Ross did not respond to Plaintiff's May 13, 2022 email to him objecting to Related's vaccination policy, which email was sent months after Plaintiff requested and received an exemption from that policy.  (FAC, Ex. 1 at 39; Pl. Opp. 17-18, 23, 32). Similarly, the Court rejects Plaintiff's arguments that Defendant Katz had an affirmative obligation to intervene to resolve workplace disputes, and that his failure to intervene amounted to treating Plaintiff less well because of his religion.  (SAC 37-38; Pl. Opp. 18-19).  Finally, the Court finds that Plaintiff has not stated a viable discrimination or retaliation claim against Defendant Geer, when the allegations against her are limited to claims that she (i) continued eating and attempting to carry on a separate dinner conversation

when Plaintiff telephoned her, after normal work hours, to discuss vacating his

apartment, and (ii) failed to call him back the following day.  (SAC 43-44).

### 2.    The Court Denies Plaintiff Leave to Amend

Plaintiff requests that if the Court dismisses any of his claims, he be

allowed leave to replead.  (Pl. Opp. 1, 9).  Federal Rule of Civil Procedure

15(a)(2) provides that a court should freely give leave to amend "when justice so

requires."  Fed. R. Civ. P. 15(a)(2); *see also McCarthy* v. *Dun & Bradstreet Corp.*,

482 F.3d 184, 200 (2d Cir. 2007).  That said, it remains "within the sound

discretion of the district court to grant or deny leave to amend."  *Broidy Cap.*

*Mgmt. LLC* v. *Benomar*, 944 F.3d 436, 447 (2d Cir. 2019) (internal quotation

marks and citation omitted).  Leave may be denied, for instance, where the

proposed amendment would be futile.  *See Olson* v. *Major League Baseball*, 447

F. Supp. 3d 174, 177 (S.D.N.Y. 2020).

Plaintiff has already amended his pleadings twice, once with the aid of

Court after a lengthy conference.  In addition, the Court has considered the

new facts submitted in Plaintiff's opposition papers.  There is no suggestion in

any of Plaintiff's submissions that he could amend his allegations to remedy

the problems identified by Defendants.  *See Cuoco* v. *Moritsugu*, 222 F.3d 99,

112 (2d Cir. 2000) (affirming denial of leave to amend on futility grounds where

*pro se* plaintiff "suggested no new material she wishes to plead"); *see also*

*Baines* v. *Nature's Bounty (NY), Inc.*, No. 23-710, 2023 WL 8538172, at *3 (2d

Cir. Dec. 11, 2023) (summary order) (finding no abuse of discretion in denying

leave to amend where plaintiffs had "already amended their complaint once in

the face of a pre-motion letter from Defendants," and then "requested leave to amend again in a single, boilerplate sentence without specifying what allegations they could add or how amendment would cure any deficiencies"); *Binn* v. *Bernstein*, No. 19 Civ. 6122 (GHW) (SLC), 2020 WL 4550312, at *34 (S.D.N.Y. July 13, 2020) ("To grant Plaintiffs leave to amend would be allowing them a 'third bite at the apple,' which courts in this district routinely deny." (collecting cases)), *report and recommendation adopted*, No. 19 Civ. 6122 (GHW), 2020 WL 4547167 (S.D.N.Y. Aug. 6, 2020).  Accordingly, the Court denies Plaintiff leave to amend his complaint a third time.

## CONCLUSION

For all of the foregoing reasons, the Court GRANTS Defendants' motion to dismiss the SAC with prejudice.  The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.  The Clerk of Court is further directed to mail a copy of this Order to Plaintiff at his address of record.

SO ORDERED.

Dated:  September 5, 2025
        New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge